**GREATER SOUTHEAST COMMUNITY HOSPITAL, Plaintiff,**

v.

**Margaret HECKLER, Secretary of Health and Human Services, Defendant.**

**Civ. A. No. 84–2951.**

United States District Court, District of Columbia.

Feb. 15, 1985.

---

Guy Collier, Ann Hastings Swett, Washington, D.C., for plaintiff.

Ellen Lee Park, Asst. U.S. Atty., Washington, D.C., Diane C. Moskal, HHS, Philadelphia, Pa., for defendant.

## MEMORANDUM

GESELL, District Judge.

This Medicare reimbursement dispute is before the Court on appeal from a denial by the Provider Reimbursement Review Board (the Board) of two categories of cost claimed by plaintiff.[1] Defendant has moved for judgment on the pleadings and plaintiff has cross-moved for summary judgment. The issues have been fully briefed and argued by counsel.

The hospital is challenging the Board's refusal (1) to allow certain interest expenses on funds borrowed for capital improvement as eligible for Medicare reimbursement in fiscal years 1977 through 1980, and (2) to treat the hospital's intermediate care unit as a special care unit entitled to higher reimbursement than routine care units in fiscal years 1977, 1978 and 1980.

### I. Interest Expense

■ Part of the hospital's claimed interest expense on capital loans was disallowed for the years in question on the basis that the hospital engaged in excessive borrowing because it did not use available funded depreciation in lieu of part of the loans obtained.

The hospital engaged in extensive construction and renovation between 1974 and 1982. It obtained two commercial loans in 1976 and 1978, with total long-term borrowing totaling approximately $6.1 million, and financed the rest of the capital improvements with approximately $3.5 million of internal funds.

Medicare generally requires hospitals to use funded depreciation for capital projects before obtaining external borrowing.[2] A limited discretionary exception to this rule developed by the case law permits the Secretary to allow hospitals and other Medicare providers to defer using the deprecia-

---

1. The Board's decision became final agency action by virtue of the decision of the deputy administrator of the Health Care Financing Administration not to reverse, affirm or modify the Board's decision. The Court has jurisdiction under 42 U.S.C. § 1395oo (f) to determine whether based on the administrative record, the agency action was arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law. *See Psychiatric Institute of Washington, D.C., Inc. v. Schweiker,* 669 F.2d 812 (D.C.Cir. 1981).

2. Medicare regulations generally provide that interest expense is reimbursable if it is "necessary and proper." 42 C.F.R. § 405.419(a). Medicare encourages providers to establish "funded depreciation" accounts to be used for capital expenditures. 42 C.F.R. § 405.415(e). To the extent that a provider has funded depreciation available for capital projects, external borrowing is generally considered not necessary. *See* Medicare Provider Reimbursement Manual § 226.

tion account until the end of a multi-phased construction project, so that the hospital can obtain better terms on loans at the start of the project.

The Board found that the hospital here had not engaged in a single planned program of multi-phased construction but instead had engaged in a variety of separate related projects. This finding is supported by substantial evidence and so cannot be overturned. The hospital is unable to point to any master plan, single certificate of need, board minutes or other comprehensive documentation showing that at the outset its board of directors contemplated a phased program of construction in which use of funded depreciation would be deliberately put off until the latter years. The available documentation shows that only by post-hoc rationalizations can one conclude that there was a phased program of construction and financing.

In addition, the hospital transferred part of its funded depreciation to its foundation to be used for nursing home construction. The Board reasonably found that this was inconsistent with the purpose of the regulations concerning funded depreciation.

Accordingly, the Court finds no reason to upset the Board's finding on the interest expense disallowances. The Secretary's motion for judgment on the pleadings on this issue is granted and the plaintiff's motion for summary judgment is denied.

## II. *Intermediate Care Unit*

■ The hospital's argument that the Board should have treated its intermediate care unit as a special care unit is more troublesome. To qualify as a special care unit, the hospital must show that, among other things, the unit is one "in which the care required is extraordinary and on a concentrated and continuous basis...." 42 C.F.R. § 405.452(d)(10) (1978).[3] The parties agree that the primary focus of inquiry in this instance is whether the unit is similar to or comparable to the hospital's already recognized special care units (the

coronary care and intensive care units). *See Villa View Community Hospital, Inc. v. Heckler*, 728 F.2d 539, 541–42 (D.C.Cir. 1984); *Psychiatric Institute of Washington, D.C., Inc. v. Schweiker*, 669 F.2d 812, 814 (D.C.Cir.1981). This is a factual inquiry turning on the evidence in the record.

The hospital points out that the level of nursing care in its intermediate unit was statistically quite similar to that in its recognized intensive care and coronary care units. Nurse/patient ratios were almost identical, and nursing hours per patient day in the intermediate unit were 88 per cent of those rendered in the recognized special care units, while nursing hours in routine care areas of the hospital amounted to only 32 per cent of the hours in the special care units. Costs per patient day also were comparable between the intermediate unit and the special care units.

The Board discounts these similarities, noting primarily that nursing hours in the intermediate unit included hours of cardiac monitoring technicians. The hospital's testimony was that these technicians perform the same monitoring tasks that nurses perform in the recognized special care units. The Board has offered no justification for why the definition of nursing care should not include direct patient care rendered by specially trained skilled technicians even though they are not registered nurses. In addition, monitor technician time has been included in calculations of the level of nursing care in other cases. *E.g., Creighton Omaha Regional Health Care Corp. v. Mutual of Omaha Ins. Co.*, 1982 Medicare and Medicaid Guide (CCH) ¶ 32,134 at 10,453. That is because the proper distinction in determining nursing hours is between hours devoted to direct patient care and hours devoted to other, non-nursing tasks (such as clerical work). The Court concludes that this factor cannot justify the Board's decision.

---

**3.** The Health Care Financing Administration's interpretation of these terms can be found in *Creighton Omaha Regional Health Care Corp. v.*

*Mutual of Omaha Ins. Co.*, 1982 Medicare and Medicaid Guide (CCH) ¶ 32,134 at 10,452–53.

The hospital also offered extensive testimony from the nursing director of the intermediate unit and from a physician. The physician had admitted numerous patients to both the intermediate unit and the special care units and was a member of the hospital's critical care committee overseeing its special units. They offered uncontradicted testimony that the intermediate unit, while it may have originally been planned as a "stepdown" unit offering convalescent care, served primarily as an overflow unit for the recognized special care units. These witnesses testified that there was no significant difference between the intermediate unit and the recognized special care units in intensity of care, nurse training and skills, equipment availability or other important factors. The Board made no credibility findings against these witnesses but apparently disregarded their testimony.

There is no substantial evidence to support the finding that the intermediate care unit served in fact as a stepdown unit. The Board relied on the fact that approximately 40 per cent of the admissions to the intermediate unit were from the recognized special care units. This was said to support the contention that it served as a stepdown unit. This statistic alone proves little in the face of the other evidence showing that patients in the intermediate unit were subject to continuous monitoring and in other respects received the requisite "extraordinary, concentrated and continuous" care.

Finally, the Board concluded that the hospital had failed to show that it had written guidelines for the unit for the fiscal years in question, as required by the regulation. However, the uncontradicted testimony was that written guidelines were kept but were updated each year and the old guidelines were thrown out. Guidelines for a later year were presented and competent witnesses testified they were substantially identical to the guidelines for the years at issue. These guidelines clearly applied specifically to the intermediate unit, as required by the regulation. While they provide some support for the contention that the unit in some respects could have served as a stepdown, the written guidelines cannot substitute for testimony as to what actually occurred in the unit to determine how the unit functioned in fact as opposed to on paper.

The substantial evidence test applicable in cases such as this does not require that the weight of the evidence support the Secretary's decision. However, "[a]t a minimum ... a decision is not supported by substantial evidence unless there is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Airport Shuttle Service, Inc. v. ICC,* 676 F.2d 836, 840 (D.C.Cir.1982). Based on the record here and the foregoing analysis, the Court is of the firm view that the Board's disallowance of the intermediate care unit does not meet this standard when viewed in light of the applicable regulations. When one focuses on how the unit actually functioned, it is apparent that it provided virtually the same intensity of services as those given on the recognized special care units. Accordingly, the plaintiff's motion for summary judgment on this issue is granted and the defendant's motion is denied.